## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLANIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**DAYAKAR R. MALLU,**<br><br>**Defendant.** | **COMPLAINT**<br><br>2:21-cv-1251<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "SEC") files this complaint against Defendant Dayakar R. Mallu ("Mallu") and alleges as follows:

### SUMMARY

1.      This case involves insider trading by Dayakar R. Mallu in the securities of Mylan N.V. ("Mylan" or the "Company").  Between September 2017 and July 2019, Mallu was tipped material nonpublic information by a Senior Manager at Mylan concerning the Company's financial results, an acquisition, and two drug application approvals by the U.S. Food and Drug Administration ("FDA").  Mallu then unlawfully traded on that information, illicitly gaining $7,348,207 while avoiding losses of $703,337.  In exchange for the tips, Mallu shared a portion of his illicit trading profits with the Senior Manager.

2.      By engaging in the conduct described in this complaint, Mallu violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), 21A, and 27 of the Exchange Act Section 27 [15 U.S.C. §§ 78u(d), 78u(e), 78-1, and 78aa].

4.      Venue lies in this District under Sections 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78aa].  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within the Western District of Pennsylvania.  Mallu improperly traded in the securities of Mylan, a company that is headquartered in the Western District of Pennsylvania.

## DEFENDANT

5.      **Mallu**, age 51, lives in Orlando, Florida.  Mallu began working at Mylan in May 2011.  In August 2014, he was promoted to the position of Global Producer Functions IT, and served in that role until he separated from Mylan in March 2017.  While at Mylan, Mallu was a colleague and close friend of the Senior Manager.

## OTHER RELEVANT ENTITIES AND INDIVIDUAL

6.      **Mylan** was a pharmaceutical company registered in the Netherlands with headquarters in Canonsburg, Pennsylvania.  Until November 2020, when it merged with Upjohn, Inc., Mylan's securities were registered with the Commission pursuant to Section 12(b) of the Exchange Act and traded on NASDAQ under the symbol "MYL."

7.      **Pfizer Inc.** ("Pfizer") is a pharmaceutical company incorporated in Delaware and headquartered in New York, New York.

8.      **Upjohn Inc.** ("Upjohn") was Pfizer's off-patent branded and generic established medicines business that merged with Mylan in November 2020.

9.      The **Senior Manager** is a resident of Pittsburgh, Pennsylvania.  During all relevant times, he held a senior position with Mylan.

## TERMS USED IN THIS COMPLAINT

10.      A stock option, commonly referred to as an "option," gives its purchaser/holder

the option to buy or sell shares of an underlying stock at a specified price (the "strike price") before a specified time (the "expiration").  Options are generally sold in "contracts," which give the option holder the opportunity to buy or sell 100 shares of an underlying stock.  If the holder does not exercise the option prior to the expiration date, the option expires as worthless.

11.    A "call" option, such as those purchased and sold by Mallu, gives the purchaser/holder of the option the right, but not the obligation, to purchase a security at a specified strike price prior to expiration.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase prior to expiration.  If the call option's strike price is above the price at which the underlying stock is trading, the call option is considered to be "out of the money," because it would be unprofitable to exercise the call and pay more for the stock than the price for which it could be obtained in the market.  Conversely, if the strike price is below the then-current market price, the call is considered to be "in the money," because one could exercise the option, obtain the stock at the strike price, and then sell it at the higher market price for a profit.  For a given expiration month, out of the money options are typically cheaper to buy than those that are in the money.

12.    A "put" option, such as other options purchased and sold by Mallu, gives the purchaser/holder of the option the right, but not the obligation, to sell a security at a specified strike price prior to expiration.  Generally, the buyer of a put option anticipates that the price of the underlying security will decrease prior to expiration.  If the put option's strike price is below the price at which the underlying stock is trading, the put option is considered to be "out of the money," because it would be unprofitable to exercise the put and sell the stock at a lower price than the price for which it could be sold in the market.  Conversely, if the strike price is above the then-current market price, the put is considered to be "in the money," because one could

exercise the option and sell the stock at the higher strike price for a profit.  For a given expiration month, out of the money options are typically cheaper to buy than those that are in the money.

## FACTUAL ALLEGATIONS

### I.    The Senior Manager Learned Material Nonpublic Information

13.    During the relevant period, through his position at Mylan, the Senior Manager learned material nonpublic information relating to Mylan and its business, financial performance, products, and potential corporate transactions, including the information discussed in more detail in this complaint.

### II.   The Senior Manager Tipped Material Nonpublic Information in Violation of a Duty Owed to Mylan's Shareholders

14.    At all times pertinent to this complaint, the Senior Manager owed a duty to Mylan's shareholders to maintain the confidentiality of material nonpublic information regarding Mylan.  On or about October 5, 2014, the Senior Manager acknowledged receipt of Mylan's Code of Conduct, which specifically prohibited trading in Mylan securities while in possession of material nonpublic information about the Company or causing or recommending others to do so.  Additionally, in his employment agreement with Mylan, the Senior Manager agreed not to use or disclose any Mylan confidential information.

15.    At all times pertinent to this complaint, Mallu knew the Senior Manager was privy to material nonpublic information regarding Mylan.  Mallu further knew that the Senior Manager was subject to a duty to keep that information confidential because, among other things, Mallu was familiar with Mylan's Code of Conduct from his time working at the Company.

16.    Notwithstanding his obligation to maintain the confidentiality of Mylan material nonpublic information, the Senior Manager tipped material nonpublic information to Mallu on four separate occasions, as set forth in paragraphs 20 through 34.

17.     The Senior Manager tipped this information in exchange for a personal benefit.

18.     Mallu and the Senior Manager established a meaningfully close personal relationship while working together at Mylan between October 2014 and March 2017.  The two maintained this friendship following Mallu's separation from Mylan and at all times pertinent to this complaint.  Among other things, Mallu and the Senior Manager regularly spoke on the telephone, messaged each other, and socialized in person in the United States as well as abroad. Additionally, the two shared both work and cultural interests, visited each other's homes and attended events with one another's families.

19.     At all times pertinent to this complaint, Mallu and the Senior Manager also had an understanding that Mallu would share a portion of his trading profits with the Senior Manager in exchange for the material nonpublic information provided by the Senior Manager.

**A.     The October 3, 2017 FDA Approval**

20.     In or around September 2017, the Senior Manager became aware, through his position at Mylan, that Mylan would soon publicly announce that the FDA had approved Mylan's Abbreviated New Drug Applications for Glatiramer Acetate Injections, which represented the first generic options for Copaxone, a multiple sclerosis treatment.  Expecting the announcement to have a positive impact on Mylan's stock price, the Senior Manager tipped this information to Mallu in September 2017 both in person and during telephone calls so that Mallu could trade on it.

21.     On September 29, 2017, the Senior Manager informed Mallu by telephone that the announcement would occur soon.  That same day, Mallu purchased 1,100 Mylan call option contracts in his brokerage account for $799,945.

22.     On October 3, 2017, after the market closed, Mylan announced the FDA approval

of Mylan's Abbreviated New Drug Applications for Glatiramer Acetate Injections.  The following day, Mylan's share price closed at $37.80, which was $5.27 or 16.2% higher than the previous day's closing price of $32.53.  The value of Mallu's options contracts increased by $691,555.

23.      During at least one conversation concerning this announcement, Mallu and the Senior Manager confirmed their understanding that Mallu would pay the Senior Manager a portion of his trading profits in exchange for the material nonpublic information the Senior Manager had provided.

   **B.      The January 31, 2019 FDA Approval**

24.      In January 2019, the Senior Manager became aware, through his position at Mylan, that the FDA was expected to approve Mylan's application for Wixhela Inhub, the first market generic of Advair Diskus, a drug that treats asthma.  Knowing that the announcement was likely to have a positive impact on Mylan's stock price, the Senior Manager tipped this information to Mallu through a secure messaging and calling application so that Mallu could trade on it.

25.      On January 29, 2019, after being tipped by the Senior Manager, Mallu purchased 1,000 Mylan call option contracts in his brokerage account for $38,801.

26.      On January 30, 2019, the FDA announced it had approved Mylan's generic of Advair Diskus.  That day, Mylan's share price closed at $30.82 per share, which was $2.05 or 7.13% higher than the previous day's closing price.  The value of Mallu's option contracts increased by $84,199.

### C.      The February 26, 2019 Fourth Quarter and Fiscal Year 2018 Earnings Announcement

27.      On January 30, 2019, the Senior Manager became aware, through his position at Mylan, that Mylan would announce lower-than-expected financial results for the fourth quarter and full year 2018.  The Senior Manager knew that this would have a negative impact on Mylan's stock price and, several weeks later, tipped this information to Mallu using a secure messaging and calling application so that Mallu could trade on it.

28.      On February 26, 2019, after being tipped by the Senior Manager, Mallu paid $949,888 to close 1,407 Mylan put option contracts that he had originally written the year before. In other words, Mallu expected Mylan's share price to decrease and sought to avoid losing money on his existing position.  Additionally, that same day, Mallu sold 5,502 Mylan call option contracts, earning $3,058,148, and used those premiums to purchase 7,074 Mylan put option contracts, including one series that expired only three days later, for $2,367,103.  Mallu made these trades to profit on the decrease in Mylan's share price that he expected to occur.

29.      On February 26, 2019, after the market closed, Mylan announced lower-than-expected fourth quarter and full year 2018 financial results.  Additionally, the Company projected 2019 guidance below analysts' estimates.  The following day, Mylan's share price closed at $26.01, which was $4.52 or 15.06% lower than the previous day's closing price.  By closing his existing put option contracts before the announcement, Mallu avoided losses of $703,337.  Additionally, the negative news announced by Mylan caused the value of Mallu's newly opened options contracts to increase by $4,298,040.

### D.      The July 29, 2019 Merger Announcement

30.      On May 2, 2019, the Mylan Board of Directors was contacted by Pfizer management concerning a possible combination of Mylan and Upjohn, Pfizer's off-patent

branded and generic established medicines business.

31.     On May 8, 2019, representatives of Mylan and Pfizer discussed the possible business combination and the need for each to conduct due diligence in order to evaluate the transaction.  Over the next several weeks, Mylan granted Pfizer and its advisors access to a virtual data room containing proprietary information about Mylan and its business operations.

32.     The Senior Manager was involved in integration planning and due diligence for Mylan relating to the transaction with Pfizer.  The Senior Manager tipped Mallu about the impending merger, conveying to Mallu that he believed the merger would be well-received and have a positive impact on Mylan's stock price, and periodically updated Mallu on the progress of the negotiations.

33.     The Senior Manager and Mallu discussed the transaction several times using a secure messaging and calling application and, in mid-July 2019, the Senior Manager informed Mallu that Mylan would soon announce the transaction with Pfizer.  On the basis of that information, between July 18, 2019 and July 23, 2019, Mallu purchased 13,003 Mylan call option contracts for $8,412,432.

34.     On July 29, 2019, before the market opened, Mylan and Pfizer jointly announced that Mylan would merge with Upjohn, Pfizer's off-patent branded and generic established medicines business, to create a new pharmaceutical company.  That day, Mylan's share price closed at $20.78 per share, which was $2.32 or 12.57% higher than the prior trading day's closing price.  The value of Mallu's options contracts increased by $2,274,413.

**III.     Mallu Makes Cash Payments to the Senior Manager in Exchange for Material Nonpublic Information Concerning Mylan**

35.     On several occasions following Mallu's trades, Mallu personally made or directed others to make payments in Indian rupees to the Senior Manager or one or more individuals the Senior Manager designated, in exchange for the material nonpublic information concerning Mylan that the Senior Manager had tipped to Mallu.  The Senior Manager directed Mallu to make these payments in person, in India, in cash in order to avoid detection.

**IV.     Mallu Violated the Federal Securities Laws**

36.     As detailed above, the information about the announcements the Senior Manager tipped to Mallu was material and nonpublic.  A reasonable investor would have viewed the information as being important to his or her investment decision.

37.     As a corporate insider, the Senior Manager owed a duty to Mylan's shareholders.

38.     Pursuant to Mylan's Code of Conduct, the Senior Manager also owed a duty to Mylan not to tip material nonpublic information to any other person so that they could trade in Mylan securities on the basis of the information.

39.     In breach of the Senior Manager's duty owed to shareholders of Mylan, the Senior Manager knowingly or recklessly tipped Mallu material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn.

40.     The Senior Manager and Mallu knew, or were reckless in not knowing, that the Senior Manager breached this duty by tipping Mallu material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn, while knowing, or recklessly not knowing, that Mallu would trade on this information.

41.     The Senior Manager and Mallu shared a meaningfully close personal relationship.

42.     The Senior Manager received financial payments from Mallu as a "quid pro quo"

in exchange for tipping material nonpublic information.

43.    The Senior Manager received a personal benefit in exchange for tipping material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn to Mallu.

44.    Mallu knew, consciously avoided knowing, was reckless in not knowing, or should have known that the Senior Manager disclosed the information in breach of that duty and that the Senior Manager received a personal benefit.

45.    When the Senior Manager tipped the material nonpublic information to Mallu, Mallu assumed the duty to maintain the confidentiality of the information.  Mallu breached this duty by knowingly or recklessly trading on the material nonpublic information.

46.    The Senior Manager knew, or was reckless in not knowing, that it was a violation of the securities laws to tip Mallu material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn.

47.    Mallu knew, or was reckless in not knowing, that it was a violation of the securities laws to trade on the basis of material nonpublic information concerning Mylan's drug approvals, financial performance, and merger with Upjohn.

### CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

48.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 47.

49.    By engaging in the conduct described above, Mallu, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has

a) employed one or more devices, schemes, or artifices to defraud;

b) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

50.     By reason of the foregoing, Mallu has violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently restraining and enjoining Mallu from directly or indirectly engaging in conduct in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Mallu to pay a civil monetary penalty pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

### III.

Permanently prohibiting Mallu from serving as an officer or director of any company that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that

is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant

to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**IV.**

Granting any other and further relief this Court may deem just and proper.

Respectfully submitted.

Dated:  September 17, 2021

Christopher R. Kelly (NY 4247722)
Brendan P. McGlynn
Jennifer C. Barry
Scott A. Thompson
Matthew B. Homberger
Christine R. O'Neil
SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
(215) 597-3741 (Kelly)
(215) 597-2740 (fax)
kellycr@sec.gov